UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

ELISE BENTLEY,
        Plaintiff,

    v.                                CASE NO. 3:14-cv-1157 (VAB)

GREENSKY TRADE CREDIT, LLC,
TRI-STATE OF BRANFORD, LLC,
BRAD POMPILLI, and DAN ROE,
        Defendants.

**RULING ON PLAINTIFF'S MOTION FOR JOINDER AND
DEFENDANT GREENSKY'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Elise Bentley, has brought this action seeking compensatory and

punitive damages, attorney's fees and costs, and injunctive relief against various actors

she believes to have been involved in an alleged scheme to defraud her.  Compl. at 17,

ECF No. 1.  Defendants are two entities, GreenSky Trade Credit, LLC ("GreenSky"),

Tri-State of Branford, LLC ("Tri-State"), as well as two individuals who were affiliated

with Tri-State[1], Brad Pompilli and Dan Roe.  *Id.* ¶¶5-8; GreenSky's Local Rule 56(a)1

Stmt. ¶1, ECF No. 81.  In the currently operative Complaint, Ms. Bentley makes claims

against all Defendants under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681

*et seq.*, the Federal Truth in Lending Act ("TILA"), 15 U.S.C. §1601 *et seq.*, the

Connecticut TILA, Conn. Gen. Stat. §§36a-675, 36a-685, and the Connecticut Unfair

Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §41-110a *et seq*.  Compl. at Counts

---

[1] The parties dispute the relationship between Tri-State and these two individuals.  GreenSky indicates that Messrs. Pompilli and Roe are co-owners and employees of Tri-State.  GreenSky's Local Rule 56(a)1 Stmt. ¶1, ECF No. 81. Ms. Bentley agrees that Mr. Roe was a Tri-State employee, a sales representative, but contends that he did not own any portion of Tri-State.  Pl.'s Local Rule 56(a)2 Stmt. ¶1, ECF No. 92.  She contends that Mr. Pompilli is the sole owner of Tri-State.  *Id.*

Two to Four, ECF No. 1.  In Count Five, she also alleges that GreenSky is vicariously

liable for the conduct of the other Defendants.  Compl. at Count Five, ECF No. 1.[2]

After Ms. Bentley filed her Complaint, Tri-State filed for bankruptcy.  Suggestion

of Bankruptcy, ECF No. 33.  Under 11 U.S.C. §362(a)(1), the Court stayed the case

against Tri-State pending the resolution of the bankruptcy proceeding.  Order dated

12/16/014, ECF No. 39; 11 U.S.C. §362(a)(1) (noting that a stay must enter in a case

against a debtor that "was or could have been commenced" before the bankruptcy

petition was filed or in a case seeking to recover "a claim against the debtor that arose

before" the bankruptcy case commenced).  The stay was entered after the Court entered a

default judgment against Tri-State, ECF No. 25[3], for failing to appear or otherwise defend

the action, but before a hearing on damages could be held.  The stay with respect to Tri-

State remains in effect at the time of this ruling.  The case has proceeded as to all other

parties.[4]

Ms. Bentley has filed a Motion for Joinder, ECF No. 68, which seeks leave to add

Union First Market Bank (formerly known as StellarOne Bank) as a Defendant as well as

---

[2] Outside of the claims made in separate counts, the currently operative Complaint also mentions the
Connecticut Home Improvement Act, Conn. Gen. Stat. §20-418 *et seq.*, the Home Solicitation Sales Act,
Conn. Gen. Stat. §42-134a *et seq.*, and Connecticut's usury statute, Conn. Gen. Stat. §37-4.  *See* Compl.
¶¶84, 87, 89, 90-91, ECF No. 1.  Ms. Bentley's Complaint notes these statutes in the context of her claims
under TILA and CUTPA.  *See id.*  Thus, the Court will only consider these statutes in the context of these
claims.  The Complaint also includes allegations that the Defendants have violated various criminal laws.
*Id.* ¶¶51, 64 (citing Conn. Gen. Stat. §53a-139 (forgery) and 18 U.S.C. §1341 (mail fraud)).  The Court will
not address these claims, as it does not appear that Ms. Bentley seeks relief under these statutes.
[3] The Court also entered a default judgment against Mr. Pompilli but later set the judgment against him
aside upon his motion.  Orders dated 1/26/2015 and 1/28/2015, ECF Nos. 46, 47.
[4] Typically, a stay under 11 U.S.C. §362 applies to the debtor only.  *See Teachers Ins. and Annuity Ass'n of
Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) ("It is well-established that stays pursuant to §362(a) are
limited to debtors and do not encompass non-bankrupt co-defendants.") (collecting cases).  While the stay
is in place, the case continues as to all other parties, and the Court can adjudicate the matter fully only as to
them.  *See e.g., Heicklen v. U.S. Dep't of Homeland Sec.*, No. 10 Civ. 2239 (RJH)(JLC), 2011 WL 3841543
(S.D.N.Y. Aug. 30, 2011) (recommending that a motion to dismiss be granted as to all defendants, except
the debtor against whom the action had been stayed under 11 U.S.C. §362(a)), *Report and
Recommendation adopted by* 2011 WL 4442669 (Sept. 23, 2011).

to add claims of negligence, against the bank only, and identity theft, against the bank and the current Defendants.  Proposed Am. Compl., ECF No. 68-2.  GreenSky has filed a motion for summary judgment, ECF No. 80, which asks the Court to summarily dismiss all claims against GreenSky.  The Court has taken up the motions together because they deal with similar legal questions.  Order dated 6/30/2015, ECF No. 84.

For the reasons that follow, the Motion for Joinder, ECF No. 68, is **DENIED**, in that Ms. Bentley may not add Union First Market Bank as a party to this case.  However, to the extent the motion seeks to add identity theft claims against Defendants Roe and Pompilli, that request is **GRANTED**.  GreenSky's Motion for Summary Judgment, ECF No. 80, is also **GRANTED** in its entirety.

### I.       Motion for Joinder (ECF No. 68)

Ms. Bentley, asks the Court to add Union First Market Bank as a party to the instant action under Federal Rules of Civil Procedure 20(a)(2) and 15(a)(2).  Mot. for Joinder, ECF No. 68. GreenSky concedes that the requirements of Rule 20 are met but objects to the motion because, it argues, the proposed claims against the bank are futile.  Opp. Br. 4, ECF No. 74.  For the reasons that follow, the Court agrees and denies Ms. Bentley's request to add Union First Market Bank as a party to the case.

Ms. Bentley initially filed a motion seeking to add Union First Market Bank under Rule 19 on February 5, 2015, ECF No. 50.  Although the motion was filed after the Court's deadline to add parties had elapsed, the Court found that Ms. Bentley had shown good cause to amend the schedule and considered her arguments to add the bank on the merits.  Ruling on Pl.'s Mot. to Add a Def. 6, ECF No. 61.  The Court ultimately denied the February 5 motion, because it determined that adding the bank under Rule 19 was

3

improper.  *Id.* at 9.  The Court also noted that Ms. Bentley had failed to file a proposed amended complaint, clarifying the nature of the claims she would allege against Union First Market Bank.  *Id.* at 9-10. The Court provided Ms. Bentley with thirty days to file a revised motion to add Union First Market Bank.  *Id.* at 6.

In this motion, Ms. Bentley has cured these defects by moving to add the bank under Rule 20 and attaching a Proposed Amended Complaint, ECF No. 68-2.  In her Proposed Amended Complaint, Ms. Bentley alleges that Union First Market Bank "was in the business of issuing various types of loans, credits and other consumer banking products, services and programs, including the GreenSky Installment Loan Program which is the subject of this action."  *Id.* ¶9.  She makes this claim based on a contract produced by GreenSky during the course of discovery, which shows that Stellar One Bank, Union First Market Bank's predecessor, was the "actual creditor" on the installment loan issued by GreenSky to Ms. Bentley.  Ruling on Pl.'s Mot. to Add a Def. 6, ECF No. 61; Mot. for Joinder Br. 2, ECF No. 68-1.

Since GreenSky concedes that the requirements of Rule 20 are satisfied, the Court need not address them.  Opp. Br. 4, ECF No. 74.  Instead, the Court must decide whether the claims asserted against Union First Market Bank are futile.

### A.  Standard

"Once a responsive pleading has been served, 'a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.'"  *Jones v. New York State Div. of Military and Naval Affairs*, 166 F.3d 45, 50 (2d Cir. 1999) (quoting Fed. R. Civ. P. 15(a)).  Leave to amend is freely given under Rule 15(a) "in the absence of bad faith or prejudice to the

nonmoving party." *R&M Jewelry, LLC v. Michael Anthony Jewelers, Inc.*¸ 221 F.R.D. 398, 399 (S.D.N.Y. 2004) (citing *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  However, a Court may deny leave to amend if the proposed amendment would be futile because it fails to state a claim that would survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *Lucente v. Int'l. Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002) (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must state a claim for relief that is plausible on its face.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusion," or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual enhancement."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  In determining whether the plaintiff has met this standard, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  *See Newman & Schwartz v. Asplundh Tree Expert Co., Inc.*, 102 F.3d 660, 662 (2d Cir. 1996) (citations omitted).

### B.  Vicarious Liability (Count Five)

Ms. Bentley has a separate count of "vicarious liability" in the Proposed Amended Complaint. Proposed Am. Compl. ¶¶98-102, ECF No. 68-2.  Indeed, the crux

of Ms. Bentley's allegations against Union First Market Bank is that the bank is vicariously liable for the actions of all other named Defendants.  Proposed Am. Compl. ¶¶99-100, ECF No. 68-2.  The Court finds that Ms. Bentley has failed to allege facts that raise a plausible inference that Union First Market Bank had an agency relationship with any of the current Defendants.

In support of her claim that the bank is vicariously liable for the actions of the other Defendants, Ms. Bentley identifies the bank as "the principal or master of its servants or agents or Sales Consultants/Associates," which she identifies as the other named Defendants.  *Id.* ¶9.  She also claims that the other named Defendants are "third party administrators/servicers" of the bank under 12 U.S.C. §1867(c), a statute that regulates the extent to which activities outsourced to third parties by a "depository institution" are monitored and examined by the "appropriate Federal banking agency." 12 U.S.C. §1867(c); Proposed Am. Compl. ¶¶5-9, ECF No. 68-2.  She alleges that, under this statute, "the services related to the GreenSky Installment Loan transaction are deemed to have been performed by the Bank itself on the Bank's own premises." Proposed Am. Compl. ¶100, ECF No. 68-2.  Other than these allegations, and the fact that the word "Defendants" now includes the bank, Ms. Bentley's Complaint contains no more information about the relationship of the bank to the other Defendants in this case.

The Court finds that 12 U.S.C. §1867 does not create an agency relationship between the bank and the current Defendants.  Ms. Bentley has not cited a single case applying this statute to find an agency relationship, nor has the Court been able to find any.  Indeed, this statute applies to government regulation of banks and does not provide any private right of action.  *See Sobernais v. Mortg. Elec. Registration Sys., Inc.*, No. 13-

CV-1296-H (KSC), 2013 WL 4046458, at *6-7 (S.D. Cal. Aug. 8, 2013).  References to this statute are, therefore, irrelevant to alleging an agency relationship between the bank and the other Defendants in this case.

Other than the reference to this statute, Ms. Bentley provides nothing more than conclusory allegations of an agency relationship between the bank and the other Defendants.  Such allegations are insufficient to state a plausible claim for vicarious liability.  *See Caro v. Fid. Brokerage Servs.*, No. 3:14-CV-01028 (CSH), 2015 WL 1975463, at *11 (D. Conn. Apr. 30, 2015) (citation omitted) ("A conclusory assertion that an agency relationship exists between co-defendants will not be accepted as true; rather, that assertion will be afford the assumption of truth only if it is accompanied by well-pleaded allegations in support of each common law element of agency.").  Because Ms. Bentley has failed to sufficiently plead facts in support of an agency relationship, all of her claims against the bank based on a theory of vicarious liability are futile.

### C.  FCRA (Count Two)

Ms. Bentley alleges that the bank violated the FCRA.  The FCRA imposes various requirements on consumer reporting agencies[5] to ensure that they adopt "'reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.'"  *See Trikas v. Universal Card Servs. Corp.*, 351 F.Supp.2d 37, 41 (E.D.N.Y. 2005) (quoting 15 U.S.C. §1681(b)).  The FCRA establishes civil liability for

---

[5] The statute defines "consumer reporting agencies" as any person who "regularly engages… in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties."  15 U.S.C. §1681a(f).

both willful and negligent noncompliance with the statute.  15 U.S.C. §§1681n-1681o.[6]

It also provides criminal liability for "knowingly and willfully obtain[ing] information on

a consumer from a consumer reporting agency under false pretenses."  15 U.S.C. §1681q.

Ms. Bentley alleges that the bank has violated the FCRA because it obtained her credit

report for an impermissible purpose and did so either negligently, willfully, and/or under

false pretenses.  Proposed Am. Compl. ¶¶73-74, ECF No. 68-2.

Section 1681b(f) prohibits the use of a consumer report unless it is obtained in

accordance with the purposes or circumstances listed in the statute, and "the purpose is

certified in accordance with section 1681e [ ] by a prospective user of the report."  15

U.S.C. § 1681b(f).  "To state a claim for civil liability based on Section 1681b, a plaintiff

must allege both that the defendant used or obtained the plaintiff's credit report for an

impermissible purpose, and that the violation was willful or negligent."  *Braun v. United

Recovery Sys., LP,* 14 F.Supp.3d 159, 166 (S.D.N.Y. 2014) (collecting cases setting forth

the standard) (citations omitted).

One permissible purpose for pulling a credit report is when the user "has reason to

believe" that a person "intends to use the information in connection with a credit

transaction involving the consumer on whom the information is to be furnished and

involving the extension of credit to [ ] the consumer."  15 U.S.C. §1681b(a)(3)(A).  In

assessing the "reason to know" aspect of this authorized purpose, the Court's focus is on

the intent of the party obtaining the credit report.  *Trikas*, 351 F.Supp.2d at 42 ("the plain

language of the statute [ ] focuses on the *intent* of the party obtaining the consumer

report") (emphasis in original).

---

[6] "A plaintiff may recover actual, punitive, or statutory damages for willful violations, but may recover only actual damages for negligent violations."  *Ritchie v. Northern Leasing Sys., Inc.*, 14 F. Supp. 3d 229, 234 (S.D.N.Y. 2014) (citation omitted).

Ms. Bentley fails to plead any specific facts that enable an inference that StellarOne Bank knew or had reason to know that it was using the credit report for an impermissible purpose under the statute.  Ms. Bentley alleges that Mr. Roe completed a GE Capital Loan application on her behalf and that subsequently, she received a letter from GreenSky approving her loan.  Proposed Am. Compl. ¶¶14, 48, ECF No. 68-2.  She further alleges that StellarOne "was in the business of issuing various types of loans, credits and other consumer banking products, services and programs, including the GreenSky Installment Loan Program."  *Id.* ¶9.  None of these allegations indicate that StellarOne Bank knew or should have known that it was obtaining a consumer report for an improper purpose.  *See Wells v. Craig & Landreth Cars, Inc.*, CIVIL ACTION NO. 3:10-CV-00376, 2010 U.S. Dist. LEXIS 123332, at 6-7 (W.D. Ky. Nov. 18, 2010) (granting a motion to dismiss a section 1681b claim against a lender for failure to allege facts "that would raise the inference that [the lender] should have doubted [a car dealer's] intentions when it submitted [an] application [on the borrower's or consumer's behalf]").

Second, Ms. Bentley alleges no facts from which anyone could plausibly infer Stellar One Bank's state of mind.  Merely stating the violation was "willful" or "negligent" is insufficient; instead, Ms. Bentley must have pled specific facts regarding StellarOne's state of mind or plausibly raising an inference that the bank acted carelessly. *See Braun,* 14 F.Supp.3d at 167, 172-74 (noting that "various courts have held that, in order to survive a motion to dismiss, the plaintiff's complaint must allege specific facts as to the defendant's mental state when the defendant accessed the plaintiff's credit report" and granting a motion to dismiss a complaint of a willful violation of section 1681b because it failed to make such factual allegations); *see also Harms v. BAC Home Loans*

*Servicing, LP*, No. C 11-02757 CW, 2011 WL 5884137, at *4 (N.D. Cal. Nov. 23, 2011)

(holding that plaintiff's FCRA claims failed because they were "wholly conclusory").

She makes conclusory allegations that the bank's actions were willful or negligent, but

does not otherwise plead facts supporting those conclusory statements.

Ms. Bentley also claims that the bank violated section 1681q, which provides that

any person who "knowingly and willfully obtains information on a consumer from a

consumer reporting agency under false pretenses shall be fined [ ], imprisoned for not

more than 2 years, or both." 15 U.S.C. §1681q; Proposed Am. Compl. ¶74, ECF No. 68-

2. The Second Circuit has held that a violation of this provision triggers civil liability

under subsection n of TILA. *See Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 47

(2d Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S.

506 (2002); *see also Ali v. Vikar Mgmt. Ltd.*, 994 F.Supp. 492, 498 (S.D.N.Y. 1998)

("Obtaining a consumer report for an impermissible purpose under the FCRA, without

disclosing that impermissible purpose, constitutes obtaining the report under false

pretenses.") (citation omitted). Because this subsection requires that the user obtain

consumer information "knowingly and willfully," Ms. Bentley's claim under section

1681q fails for the same reasons discussed above.

Accordingly, all of Ms. Bentley's FCRA claims against the bank are futile.

### D. TILA (Count Three)

Ms. Bentley alleges that "Greensky and or [sic] the Bank, as a creditor" provided

Ms. Bentley with a loan that she did not apply for at an "unconscionable interest rate"

and misrepresented the interest rate as 3.9%, when it was in fact higher. Proposed Am.

Compl. ¶¶77, 79, ECF No. 68-2. She alleges that "GreenSky and its brokers and or [sic]

agents" failed to disclose the terms, rates and conditions of the loan on the timeframe required by TILA. *Id.* ¶78. Ms. Bentley claims that these actions violated sections 1637(a), 1638(a), and/or 1638(b)(2)(c) of TILA, and analogous provisions of the Connecticut TILA, Conn. Gen. Stat. §§ 36a-675-36a-685. *Id.* ¶¶80, 83; 15 U.S.C. §§1637(a), 1638(a), 1638(b)(2)(c). The cited TILA sections provide a list of "required disclosures" a creditor must make to borrowers in various circumstances. Section 1640 of the Federal Act provides a civil remedy for failure to comply with TILA's provisions. 15 U.S.C. §1640.

The cited Connecticut provisions essentially incorporate the terms of the federal law. *See* Conn. Gen. Stat. 36a-678(a) ("Except as otherwise provided… each person shall comply with all provisions of [Federal TILA]"). Federal TILA and Connecticut TILA "are generally coextensive;" thus federal case law interpreting relevant provisions of TILA applies "where there is an absence of Connecticut authority." *Bank of New York v. Conway*, 916 A.2d 130, 137 (Conn. Super. Ct. 2006). Ms. Bentley has identified no salient difference between Connecticut and federal law. Accordingly, the Court will treat the analysis of the claims as the same.

"TILA seeks to 'protect… consumer[s] against inaccurate and unfair credit billing and credit card practices' and promote 'the informed use of credit' by 'assur[ing] a meaningful disclosure' of credit terms." *Vincent v. The Money Store*, 736 F.3d 88, 105 (2d Cir. 2013) (quoting 15 U.S.C. 1601(a)) (alteration in original). Section 1637(a) requires the creditor to make a number of disclosures "[b]efore opening any account under an open end consumer credit plan." The statute defines "open end credit plan" as one under which "the creditor reasonably contemplates repeated transactions… and

which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance." 15 U.S.C. §1602(j). Because "a one-time loan transaction [ ] is considered a 'closed-end credit' transaction," section 1637 does not apply to the instant case. *Douce v. Banco Popular N. Am.*, No. 05 Civ. 8979 LAK, 2006 WL 2627966, at * 8 (S.D.N.Y. Sept. 12, 2006) (citation omitted) (finding that a "retail installment" loan provided to finance the purchase of a car was a closed-end credit transaction). Thus, the claims asserted under section 1637(a) against the bank are futile.

Section 1638(a) requires certain disclosures for "consumer credit transaction[s] other than under an open end credit plan." Section 1638(b)(2)(B) requires additional disclosures to be made where "credit [ ] is secured by the dwelling of a consumer." GreenSky argues that these disclosure requirements are only triggered after the transaction is "consummated." Opp. Br. 13, ECF No. 74 (citing 12 C.F.R. §226.17(b)). Because Ms. Bentley never availed herself of the credit, GreenSky argues, the transaction was not consummated. *Id.* at 14-15. The Court agrees.

Section 1638(b)(1) provides that disclosures required under section 1638 must be made "before the credit is extended." The Federal Reserve's Regulation Z[7] has interpreted this phrase to mean "before consummation of the transaction." 12 C.F.R. §226.17(b) ("The creditor shall make disclosures before consummation of the transaction."); *see In re Webster*, 300 B.R. 787, 799 (Bankr. W.D. Okla. 2003) ("Such disclosures [for closed-ended transactions] must be made before credit is extended, thus before the transaction is consummated…"); *see also Harper v. Lindsay Chevrolet Oldsmobile, LLC*, 212 F. Supp. 2d 582, 587 (E.D. Va. 2002) (holding that TILA's

---

[7] TILA provides the Federal Reserve Board with "expansive authority" to implement regulations and interpretations of the Act, which are known as Regulation Z. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559-60 (1980) (citing 15 U.S.C. §1604).

requirements were satisfied in a closed-ended transaction, where the disclosures were made on the day of purchase but prior to the signing of any contract papers).  This interpretation is entitled to *Chevron* deference.  *Vincent v. The Money Store*, 736 F.3d 88, 105-06 (2d Cir. 2013) ("The Supreme Court has indicated that Regulation Z is entitled to *Chevron* deference where the Federal Reserve has reasonably interpreted an ambiguous term of TILA.") (citing *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 239-44 (2004)).

Regulation Z defines consummation as "the time that a consumer becomes contractually obligated on a credit transaction," which is a question of state law. 12 C.F.R. §226.2(a)(13); *Murphy v. Empire of Am., FSA*, 746 F.2d 931, 933-34 (2d Cir. 1984) (applying state law to determine whether a transaction was consummated because the Official Staff interpretation of the Regulation Z definition indicates that state law governs).[8]

Under Connecticut law, "consummation" occurs when both parties have become bound to the terms of the financing.  *Am. Bank of Connecticut v. Mango*, No. CV 95126053, 1998 WL 950981, at *2 (Conn. Super. Ct. Dec. 23, 1998) (citations omitted) (holding that a credit transaction was not consummated because the parties had signed the agreement but had not become bound by its terms); *see also cf. Bank of New York v. Conway*, 916 A.2d 130, 199-200 (Conn. Super. Ct. 2006) (noting in the context of consummation that "[i]t is settled law in Connecticut that '[t]o form a contract, generally there must be a bargain in which there is a manifestation of mutual assent to the

---

[8] Official staff commentary interpreting Regulation Z is worthy of deference unless "demonstrably irrational."  *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980) ("Unless demonstrably irrational, Federal Reserve Board staff opinions construing [TILA] or [Regulation Z] should be dispositive…").

exchange… made wholly or partly by written or spoken words or by other acts or by failure to act… [The] agreement… requires a clear and definite promise.'") (all alterations but the third in the original) (quoting *Bartomeli v. Bartomeli*, 783 A.2d 1050, 1055 (Conn. App. Ct. 2001)).

Ms. Bentley does not allege any facts that indicate she ever became bound by the terms of the GreenSky loan agreement.  In fact, she alleges that she did not intend to apply for the financing and that she rejected it.  Proposed Am. Compl. ¶¶49-50, ECF No. 68-2.  The allegation that she paid a deposit does not change this result, because under Connecticut law, a transaction has not been consummated "'merely [because of] some investment in the transaction, such as the making of a non-refundable deposit.'"  *Mango*, 1998 WL 950981 at *2 (quoting *Murphy*, 746 F.2d at 933 n.1).

Because the GreenSky loan was never consummated, the Court finds that the Ms. Bentley's TILA claim against the bank is futile.  This result does not allow Defendants to benefit from wrongdoing improperly, as Ms. Bentley suggests, but rather indicates that TILA does not provide a remedy for this type of factual scenario.

### E.  CUTPA (Count Four)

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn Gen. Stat. §42-110b(a).  In determining whether a practice violates CUTPA, courts have used the "cigarette rule" adopted by the Federal Trade Commission, which looks to:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is

14

> immoral, unethical, oppressive, or unscrupulous;
> (3) whether it causes substantial injury to consumers,
> [competitors or other businesspersons].... All three criteria
> do not need to be satisfied to support a finding of
> unfairness.  A practice may be unfair because of the degree
> to which it meets one of the criteria or because to a lesser
> extent it meets all three.

*Ramirez v. Health Net of Northeast, Inc.*, 938 A.2d 576, 589 (Conn. 2008) (internal

quotation marks and citation omitted); *see also A-G Foods, Inc. v. Pepperidge Farm,

Inc.*, 579 A.2d 69, 76-77 (Conn. 1990).  GreenSky argues that Ms. Bentley has not

alleged any act committed by the bank that violates CUTPA.  Opp. Br. 16, ECF No. 74.

The Court agrees.

The alleged scheme as a whole, whereby loans are issued to individuals without

their consent, may state a plausible CUTPA claim.  However, the allegations in the

Proposed Amended Complaint provide very little information on the role of the bank and

can be read only to raise an inference that it was negligent, at most.  Ms. Bentley alleges

no facts indicating that the bank created or knowingly participated in the scheme.  Mere

negligence cannot support a CUTPA claim.  *See A-G Foods, Inc.*, 579 A.2d at 77

(reversing a jury award finding liability on a CUTPA claim because the defendant's

"negligence did not constitute an 'immoral, unethical, oppressive or unscrupulous'

practice."); *see also Ulbrich v. Groth*, 78 A.3d 76, 100-01 (Conn. 2013) ("our focus []

has been on whether the defendant's breach of contract was merely negligent or

incompetent, in which case the CUTPA claim was barred, or whether the defendant's

actions would support a finding of intentional, reckless, unethical or unscrupulous

conduct.").  Thus, Ms. Bentley's CUTPA claim is futile.

### F.  Negligence (Count Six)

In her Proposed Amended Complaint, Ms. Bentley claims that the bank

negligently failed to supervise the loan application process and GreenSky's operations

generally.  Proposed Am. Compl. ¶¶104a-f, ECF No. 68-2. [9]  To state a claim for

negligence, Ms. Bentley must allege (1) the existence of a duty between the Plaintiff and

the bank, (2) a breach of that duty, (3) causation, and (4) actual injury.  *Sturm v. Harb

Dev., LLC*, 2 A.3d 859, 870 (Conn. 2010) (citation omitted).  GreenSky argues that Ms.

Bentley failed to plead the existence of a duty.  Opp. Br. 16, ECF No. 74.  The Court

agrees and finds that, as result, the negligence claim is futile.

The question of whether a duty exists is a question of law.  *See Murillo v.

Seymour Ambulance Ass'n, Inc.*, 823 A.2d 1202, 1205 (Conn. 2003) ("'The existence of a

duty is a question of law…'") (citation omitted).  "A duty to use care may arise from a

contract, from a statute, or from circumstances under which a reasonable person,

knowing what he knew or should have known, would anticipate that harm of the general

nature of that suffered was likely to result from his act or failure to act."  *Coburn v. Lenox

Homes, Inc.*, 441 A.2d 620, 624 (Conn. 1982).

Although she does not explicitly specify the alleged source of the duty, Ms.

Bentley appears to claim that a duty of care arose from statutes, namely 12 U.S.C. §1867,

Connecticut and Federal TILA, and Connecticut law criminalizing forgery, Conn. Gen.

Stat. §53a-139.  Proposed Am. Compl. ¶¶104a-f, ECF No. 68-2.  To establish a cause of

action for negligence based on the violation of a statute, a plaintiff must show he is

"within the class of persons protected by the statute" and the injury is "of the type which

---

[9] As noted above, Ms. Bentley has asserted this claim against the bank only.  Thus, the Court will not
analyze its viability with respect to the other Defendants.

the statute was intended to prevent." *Gore v. People's Sav. Bank,* 665 A.2d 1341, 1345 (Conn. 1995) (citation omitted).  To establish negligence based on a statute, a fact finder "need not decide whether the defendant acted as an ordinarily prudent person would have acted under the circumstances" but rather whether the statute has been violated.  *Shukis v. Bd. of Educ. of Reg'l Dist. No. 17,* 1 A.3d 137, 152 (Conn. App. Ct. 2010) (citing *Considine v. City of Waterbury*, 905 A.2d 70, 90 n.16 (Conn. 2006)).  If the source of the duty is statutory, the Court is also "under no compulsion to adopt the requirements of the enactment as the standard of conduct in a negligence action" if the statute does not provide for civil liability.  *See* Restatement (Second) of Torts §286 cmt. d.

Two of the statutes Ms. Bentley cites do not provide for civil liability, namely 12 U.S.C. §1867 and the Connecticut law criminalizing forgery.  Thus, the Court will not apply them to the negligence context to create a duty.  For the reasons discussed above, Ms. Bentley has failed to allege plausibly that her injury is of the kind that TILA was designed to prevent.  Because Ms. Bentley has failed to plead facts consistent with the existence of a duty, the Court finds that her negligence claim is futile.

### G.  Identity Theft (Count Seven)

Ms. Bentley alleges that all Defendants, including the proposed additional Defendant, Union First Market Bank, stole her identity to complete an application for a loan.  Proposed Am. Compl. ¶¶ 109-112, ECF No. 68-2.  She claims that, under Connecticut General Statutes section 52-571h, she is entitled to compensation for "actual damages, humiliation, intimidation, abuse, fear, mental anguish and pain and suffering." Proposed Am. Compl. ¶111, ECF No. 68-2.  Section 52-571h provides civil liability for "knowingly us[ing] personal identifying information of another person to obtain or

attempt to obtain money, credit, goods, services, property or medical information without the consent of such person." Conn. Gen. Stat. §53a-129a(a).

The Court must dismiss this claim because Ms. Bentley has failed to plead facts regarding the bank's state of mind. As found above in analyzing the FCRA claims, based on the facts currently alleged, the bank had no reason to know that Ms. Bentley's personal information and signature were not freely and properly provided on the application. Thus, this claim against the bank is futile.

The same analysis applies to GreenSky. However, the Court finds that Ms. Bentley has alleged sufficient facts to state a plausible claim against Defendants Roe and Pompilli for identity theft. The Court will not add this claim against Tri-State, because of the stay currently in place. *See* 11 U.S.C. §362 (a)(1) (providing that a bankruptcy petition operates as a stay of "the commencement or continuation… of a judicial, administrative, or other action or proceeding against the debtor").

### H.  Conclusion

For the reasons stated above, Ms. Bentley's Motion to add Union First Market Bank as a party is **DENIED**. To the extent that Ms. Bentley seeks to amend her Complaint to add an identity theft claim against Defendants Roe and Pompilli, that request is **GRANTED**. No additional claims may be added against GreenSky or Tri-State.

### II.    Motion for Summary Judgment (ECF No. 80)

GreenSky has moved for summary judgment on all claims against it. Mot. for Summ. J., ECF No. 80. GreenSky argues it cannot be liable under TILA, because Ms. Bentley failed to consummate the GreenSky loan, GreenSky Summ. J. Br. 10-13, ECF

No. 82, and that it cannot be held liable under FRCA, because, so far as it knew or had reason to know, it obtained Ms. Bentley's credit report for a valid purpose under the statute, *id.* at 13-16.  GreenSky argues that Ms. Bentley has produced no evidence indicating that GreenSky engaged in an unfair trade practice under CUTPA.  *Id.* at 21.  It also argues, with respect to all claims, that Ms. Bentley cannot prove that she is entitled to damages from GreenSky.  *Id.* at 23-25.  Finally, GreenSky argues that it cannot be held vicariously liable for the conduct of its co-Defendants because it did not have an agency relationship with them.  *Id.* at 16-20.

The Court will review the undisputed facts and address each of Ms. Bentley's claims against GreenSky in turn.

### A.  Statement of Facts[10]

As a preliminary matter, the Court notes that Ms. Bentley refuses to admit or deny some of the statements in GreenSky's Local Rule 56(a)1 Statement, because she claims that she "does not have sufficient information to admit or deny" them.  *See e.g.* Pl.'s Local Rule 56(a)2 Stmt. ¶¶17, 35, ECF No. 92.  Discovery closed before Ms. Bentley filed her response to GreenSky's summary judgment motion.  *See* Order dated 5/4/2015, ECF No. 70 (setting an August 5, 2015 discovery deadline); Opp. Br., ECF No. 93 (filed on August 17, 2015).  Moreover, the Court ordered GreenSky to provide Ms. Bentley with expedited discovery on matters relevant to responding to the summary judgment motion.  *See* Order dated 6/30/2015, ECF No. 84; Order dated 7/10/2015, ECF No. 91.  It

---

[10] These facts are based on a review of the pleadings, Local Rule 56(a) Statements, and any responses, as well as exhibits filed by both parties accompanying the Motion for Summary Judgment and related briefing.  Unless noted otherwise, facts described in this section are undisputed or the opposing party has not pointed to any contradictory evidence in the record.

also invited Ms. Bentley to seek assistance from the Court with any discovery disputes that pertained to the resolution of the summary judgment motion. *Id.*

Ms. Bentley has provided no reason why she needs additional discovery to respond to some of GreenSky's factual assertions and, more importantly, she does not indicate why she did not seek that information before discovery closed. *See Mercier v. Peterson*, 927 F. Supp. 764, 767 (D. Vt. 1996) ("When a party fails to use the time available and takes no steps to seek additional time until after a summary judgment motion has been filed, the court need not permit more discovery.") (citing *Burlington Coat Factory Warehouse Corp. v. Esprit de Corp.*, 769 F.2d 919, 928 (2d Cir. 1985)).

Moreover, at this stage, it is not enough to claim that more discovery is needed. *See* Fed. R. Civ. P. 56(c)(1) (requiring a party to claim that a fact is genuinely disputed by citing to particular parts of the record by showing that the materials cited do not establish the absence of a genuine material dispute); *see also Burlington Coat Factory Warehouse Corp.,* 769 F. 2d at 927-28 ("[W]hen alerted to a forthcoming motion for summary judgment, a party wanting more time for discovery should seek, through negotiation with the other party, and if necessary, through application to the district court, an appropriate discovery schedule. A party who fails to use the time available and takes no steps to seek more time until after a summary judgment has been filed need not be allowed more time for discovery absent a strong showing of need."). Thus, the Court will deem admitted any facts that Ms. Bentley disputes because she claims to need more discovery.

GreenSky is a "third-party service provider that partners with lenders that fund loans under the GreenSky Program." GreenSky's Local Rule 56(a)1 Stmt. ¶6, ECF No.

81.  GreenSky offers financing to consumers on home improvement projects.  *See generally* Pl.'s Ex.10, GreenSky Consumer Credit Presentation, ECF No. 93-10.  Tri-State is a home improvement company.  Pl.'s Ex. 2, Pompilli Dep. 6:16-17, ECF No. 93-2.  GreenSky had an arrangement with Tri-State, governed by the GreenSky Consumer Credit Program Agreement ("Credit Program Agreement"), whereby Tri-State customers could seek financing for their transactions with Tri-State.  GreenSky's Local Rule 56(a)1 Stmt. ¶¶7-8, ECF No. 81.

Under the Credit Program Agreement, Tri-State was tasked with "promoting" GreenSky's loan program to its customers.  Kaliban Aff., Ex. A, Credit Program Agreement ¶¶2(a)(ii), 5, ECF No. 82-4.  The Credit Program Agreement requires Tri-State to comply with certain obligations in processing loan applications and to ensure that its employees are advised of and trained on GreenSky's requirements for the Program.  *See e.g.*, *id.* ¶¶2(a)(i), 7, 8(e), 11, 14-16.  The agreement provides that Tri-State was not to provide Ms. Bentley with information about the applicable interest rate in promoting GreenSky loans.  *Id.*  ¶2(b)(ii).  It also provides that, upon submitting Ms. Bentley's application, Tri-State was representing that she agreed to apply for the credit transaction and that the transaction complied with governing laws.  *Id.*  ¶11(a).  The agreement also specifically notes that it "shall not be construed to establish" an agency relationship.  *Id.* ¶30.

On August 2, 2013, Ms. Bentley met with Dan Roe from Tri-State to discuss a loan for home improvement work.  GreenSky's Local Rule 56(a)1 Stmt. ¶2, ECF No. 81. The parties dispute the precise nature of the agreement struck as a result of this

conversation[11], but it is undisputed that Ms. Bentley discussed the possibility of Tri-State making some physical improvements to her home. *Id.* ¶3; Pl.'s Local Rule 56(a)2 Stmt. ¶¶2-3, ECF No. 92. Ms. Bentley paid Tri-State a 10% down payment on the work that was discussed, totaling $1,417. GreenSky's Local Rule 56(a)1 Stmt. ¶4, ECF No. 81. She also signed a Home Improvement Consumer Credit Application from GE Capital Retail Bank but contends that this application was "voided" the day it was signed. *Id.* ¶5; Pl.'s Local Rule 56(a)2 Stmt. ¶5, ECF No. 92.

Four days after this meeting, on August 6, 2013, Tri-State submitted an online application for an installment loan under the GreenSky Program on Ms. Bentley's behalf. GreenSky's Local Rule 56(a)1 Stmt. ¶15, ECF No. 81. Someone at Tri-State, although the precise identity of that person is unknown[12], completed the application, which included Ms. Bentley's address, phone number, social security number, birthday, and driver's license information as well as the credit limit requested. Kaliban Aff., Ex. D, Application Information, ECF No. 82-4. The application itself indicated that a "store associate" completed the application, as permitted under the Credit Program Agreement.

---

[11] Ms. Bentley contends that she signed an acknowledgment of a quote and that she did not intend to obtain any financing for the project from Tri-State. Pl.'s Local Rule 56(a)2 Stmt. ¶¶3, 31, ECF No. 92. She also argues that, even if she did sign a contract regarding the home improvements, in accordance with the Home Improvement Act, the agreement was "void" because it omitted a transaction date on the Notice of Cancellation form. Compl. ¶52-53, ECF No. 1. Defendants Roe and Pompilli testified in their depositions that Ms. Bentley had indicated interest in obtaining financing and that they had submitted an application on her behalf to GreenSky to obtain financing at the lowest rate possible. Pl.'s Ex. 2, Pompilli Dep. 65:13-19, ECF No. 93-2 ("We were trying to get your client the best rate."); Pl.'s Ex. 1, Roe Dep. 17:18-21, 22:4-17, 29:21-30:1, ECF No. 93-1 ("there's a possibly [sic] I can get you a 3.9 percent, and she was excited about it, and that's when I said what we can do is we can run your information, get you pre-approved, and then that's what happened. So we were able to get her 3.9 through GreenSky."). Both Ms. Bentley and Mr. Roe have indicated that she thought Tri-State was offering a type of government loan or funding program. Pl.'s Ex. 1, Roe Dep. 17:3-11, ECF No. 93-1; Pl.'s Ex. 8, Tr. of Telephone Call with GreenSky 2:22-3:1, ECF No. 93-8.

[12] Mr. Roe testified that he passed Ms. Bentley's personal information on to Mr. Pompilli for the GreenSky application. Pl.'s Ex. 1, Roe Dep. 31:22-32:18, ECF No. 93-1. Mr. Pompilli testified that one of two other individuals at Tri-State would have completed the application. Pl.'s Ex. 2, Pompilli Dep. 12:14-24, 34:4-14, ECF No. 93-2.

*Id.*; Kaliban Aff. Ex. A, Credit Program Agreement ¶7(d)(i), ECF No. 82-4 ("Dealer may, with customer's prior written consent, perform the following on behalf of the customer: (i) submit a completed Program credit application to GreenSky by such means as set forth in the Operating Instructions").

Ms. Bentley contends that she never intended to apply for this loan, or any other type of financing for Tri-State's work, and that Tri-State never provided her with a copy of the application. Pl.'s Local Rule 56(a)2 Stmt. ¶¶15, 17, 31, ECF No. 92. She further contends that she was not physically present when the application was submitted and did not complete any portion of it. *Id.* Mr. Pompilli admits that Ms. Bentley was not physically present when Tri-State submitted the application on her behalf but testified that he had obtained her personal information and authorization to apply over the phone. Pl.'s Ex. 2, Pompilli Dep. 32:8-19, 36:16-20, 60:24-61:1, ECF No. 93-2.

In response to the application that Tri-State submitted, GreenSky pulled and reviewed Ms. Bentley's credit report. GreenSky's Local Rule 56(a)1 Stmt. ¶17, ECF No. 81. GreenSky decided to approve her application "automatically based on a systematic review of her credit characteristics" from the credit report and its partner bank's credit policies. GreenSky's Local Rule 56(a)1 Stmt. ¶¶18-19, ECF No. 81. GreenSky then sent Ms. Bentley a letter indicating that she had been approved for the loan. *Id.* ¶20. The letter provided an overview of the loan's terms and instructions on how to obtain a copy. Kaliban Aff., Ex. E, Letter dated 8/6/2013, ECF No. 82-4.

Upon receiving the letter, Ms. Bentley called GreenSky to complain. GreenSky's Local Rule 56(a)1 Stmt. ¶¶24, 27, ECF No. 81. As a result of this complaint, GreenSky investigated the basis for Tri-State's application and, as part of that process, sought

information from Tri-State about the basis for the loan application a few weeks later. Kaliban Aff. ¶¶28-29, ECF No. 82-3.  In response, Tri-State faxed GreenSky documents relating to its agreement with Ms. Bentley, Kaliban Aff., Ex. B, Fax from Tri-State to Greensky, ECF No. 82-4, and a copy of the GE Application, which it claimed was the basis for Ms. Bentley's authorization to apply for the loan.  GreenSky's Local Rule 56(a)1 Stmt. ¶¶25-26, 28, ECF No. 81; Kaliban Aff., Ex. C, Fax from Tri-State to GreenSky, ECF No. 82-4.  GreenSky contends that it had never seen these documents until it received these faxes from Tri-State, after it had already approved Ms. Bentley's application.  Kaliban Aff. ¶30, ECF No. 83-2.

Ms. Bentley refused to accept the loan and did not sign the loan agreement. GreenSky Local Rule 56(a)1 Stmt. ¶¶31, 33-34, ECF No. 81.  In addition, the loan was never funded.  *Id.* ¶32.  As a result, Ms. Bentley never incurred a financial obligation of any kind from the loan she claims to have been improperly issued.  *Id.* ¶¶35-38.  On October 17, 2013, GreenSky asked Experian to remove the loan from Ms. Bentley's credit report.  *Id.* ¶40.

## B.  Standard

Courts must "grant summary judgment, if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party carries the burden of demonstrating that there is no genuine material dispute of fact by citing to "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1)(A)-(B); *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 133 (2d Cir. 2000).  A dispute regarding a fact is "'genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" and material if the

substantive law governing the case identifies those facts as material.  *Williams v. Utica Coll. Of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (quoting *Stuart v. Am. Cyanamid Co.,* 158 F.3d 622, 626 (2d Cir. 1998)); *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

In assessing a summary judgment motion, the Court must resolve all ambiguities, including credibility questions, and draw all inferences from the record as a whole in favor of the non-moving party.  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citation omitted).

### C.  Vicarious Liability

GreenSky argues that it cannot be held vicariously liable for the actions of its co-Defendants because it did not have an agency relationship with them.  GreenSky Summ. J. Br. 16-20, ECF No. 82.  The parties agree that three elements are required to show the existence of an agency relationship, namely: "'(1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking.'" *Wesley v. Schaller Subaru, Inc.*, 893 A.2d 389, 400 (Conn. 2006) (quoting *Beckenstein v. Potter & Carrier, Inc.*, 464 A.2d 6, 13-14 (Conn. 1983)).  They disagree as to whether the Defendants in the instant case satisfy these elements.

An agent's authority may be actual or apparent. *Ackerman v. Sobol Family P'ship, LLP*, 4 A.3d 288, 298 (Conn. 2010) (quoting *Maharishi Sch. of Vedic Sciences, Inc. (Connecticut) v. Connecticut Constitution Assocs. Ltd. P'ship*, 799 A.2d 1027, 1032 (Conn. 2002)).  Actual authority exists when an agent's action is expressly authorized or subsequently ratified by the principal. *Id.*  Apparent authority exists when (1) "'it [ ] appear[s] from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act having such authority,'" and (2) "'the party dealing with the agent [ ], acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action.'" *Id.* at 299 (third alteration in original) (quoting *Tomlinson v. Bd. of Educ. of Bristol*, 629 A.2d 333, 349 (Conn. 1993)).

Ms. Bentley bears the burden proving an agency relationship existed. *See Housatonic Valley Publ'g Co. v. Citytrust*, 492 A.2d 203, 205 (Conn. App. Ct. 1985) ("The burden of proving agency is on the party asserting its existence.") (citation omitted).  The existence of an agency relationship is question of fact. *Id.* (citation omitted).

The Court finds that Ms. Bentley has failed to show that a genuine question of material fact exists as to whether an agency relationship existed between GreenSky and the other Defendants in this case.  Ms. Bentley has failed to produce evidence that GreenSky exercised a sufficient amount of control over them.  Indeed, the very premise of the action is that the Tri-State Defendants appear to have violated certain aspects of the Credit Program Agreement with GreenSky.  Moreover, the agreement did not give the Tri-State Defendants the power to bind GreenSky legally to a given loan, merely to

submit applications for their approval.  *See LeBlanc v. New Eng. Raceway, LLC*, 976 A.2d 750, 758-59 (Conn. App. Ct. 2009) (finding that no agency relationship existed where, among other factors, the purported agent had no actual or apparent authority to directly bind the alleged principal in a contract).

Finally, Connecticut courts have found that relationships similar to this one did not create an agency relationship.  *See e.g.*, *Wesley*, 893 A.2d at 401-08 (holding that an agency relationship did not exist between a car dealership and a financing company because the financing company "does not control the actual negotiation of the initial transaction" between the dealership and its customers).  Because Ms. Bentley has failed to produce facts supporting the existence of agency relationship between GreenSky and the other Defendants in this case, summary judgment must be granted on all claims premised on vicarious liability against GreenSky.

### D.  TILA

Ms. Bentley's Complaint alleges Federal and Connecticut TILA claims against GreenSky.  Compl. at Count Three, ECF No. 1.  Ms. Bentley does not identify any relevant differences between Connecticut and Federal TILA nor does she focus on Connecticut TILA in her opposition brief; thus, the Court will treat the claims as the same.  *See Bank of New York v. Conway*, 916 A.2d 130, 137 (Conn. Super. Ct. 2006) (noting that Connecticut TILA is "generally coextensive" with Federal TILA).  As noted above, "TILA seeks to 'protect… consumer[s] against inaccurate and unfair credit billing and credit card practices' and promote 'the informed use of credit' by 'assur[ing] a meaningful disclosure' of credit terms."  *Vincent v. The Money Store*, 736 F.3d 88, 105 (2d Cir. 2013) (alterations in original) (quoting 15 U.S.C. §1601(a)).

TILA only applies to creditors.  *See id.* at 106 (affirming district court's conclusion that the defendant could not be held liable under TILA because it was not a creditor); *see also generally Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 283 n.21 (S.D.N.Y. 2011).  Ms. Bentley admits that GreenSky is not a "creditor."  Opp. Br. 18, ECF No. 93.  Indeed, the lender listed on the loan agreement is StellarOne Bank, not GreenSky.  Kaliban Aff., Ex. F, GreenSky Installment Loan Agreement, ECF No. 82-4.  GreenSky did not extend Ms. Bentley any credit under the agreement, but rather appears to be a servicer of the loan.  *Id.*

Because TILA only regulates creditors, Ms. Bentley cannot sustain a claim against GreenSky under the Act.  *See In re Residential Capital, LLC*, 501 B.R. 531, 540 (Bankr. S.D.N.Y. 2013) ("Courts have refused to find servicers liable for violations of TILA even whether they failed to communicate with the borrower or communicated erroneous information") (collecting cases); *accord Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 718-19 (6th Cir. 2013) (holding that a loan servicer cannot be held liable for TILA violations).  Accordingly summary judgment must be granted on all TILA claims against GreenSky.

### E.  FCRA

Ms. Bentley argues that GreenSky violated the FCRA because it pulled her credit report for an impermissible purpose and did so either negligently, willfully, and/or under false pretenses.  Compl. ¶¶69-75, ECF No. 1; Opp. Br. 20-23, ECF No. 93.  She also argues that GreenSky violated the FCRA because it failed to obtain written instructions from her about the use of her report.  *Id.*

As noted above, to make out a claim for civil liability under Section 1681b, a plaintiff must show that a genuine question of material fact exists as to whether the defendant "used or obtained the plaintiff's credit report for an impermissible purpose, and that the violation was willful or negligent." *Braun v. United Recovery Sys., LP,* 14 F.Supp.3d 159, 166 (S.D.N.Y. 2014) (collecting cases setting forth the standard in the motion to dismiss context) (citations omitted). In addition, the purpose must be certified in accordance with the statute. 15 U.S.C. § 1681b(f)(2). There is no evidence in the record supporting a violation of the latter provision. Thus, the Court will focus on the other elements.

Users of credit reports do not always need to obtain written instructions from the consumer before pulling a credit report. The statute provides that one circumstance in which credit reports may be obtained legally is "in accordance with the written instructions of the consumer to whom it relates." 15 U.S.C. § 1681b(a)(2); *see also Johnson v. Sherwin-Williams Co.*, No. 1:15 CV 1064, 2015 WL 4730197, at *3 (N.D. Ohio Aug. 10, 2015) ("A consumer report may also be obtained for no particular reason at all if it is consistent with the 'written instructions of the consumer to whom it relates.'") (quoting 15 U.S.C. §1681b(a)(2)). This provision does not apply to every single one of the statute's authorized purposes. *See* 15 U.S.C. §1681b(a) (listing various circumstances in which a credit report may be furnished). Thus, GreenSky's failure to obtain written instructions from Ms. Bentley before pulling her credit report does not indicate alone that it has violated FRCA.

Another circumstance in which a credit report may legally be obtained is when the user "has reason to believe" that a person "intends to use the information in

connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to [ ] the consumer." 15 U.S.C. §1681b(a)(3)(A). In assessing the "reason to know" aspect of this authorized purpose, the Court's focus is on the intent of the party obtaining the credit report. *Trikas*, 351 F.Supp.2d at 42.

GreenSky received application documents from the other Defendants in this matter indicating that Ms. Bentley was applying for a loan from its program. It pulled her credit report in response to this application to assess her suitability for the loan. This reason fits squarely within the "permissible purposes" for obtaining a credit report set forth in section 1681b(a) of the statute. 15 U.S.C. §1681b(a)(3)(A).

The record does not indicate that, when GreenSky received the application, it knew or should known that Ms. Bentley did not want to apply for such financing. Indeed, GreenSky's agreement with Tri-State provides that in submitting an application to GreenSky, Tri-State represented that it obtained the proper authorizations from the consumer and that the consumer truly sought the financing. Kaliban Aff, Ex. A, Credit Program Agreement ¶11(a), ECF No. 82-4 ("As to each credit application... [Tri-State] represents and warrants to GreenSky... that the credit application... [is] bona fide and [was] actually made and agreed to by each person identified as an applicant or Borrower").

Because Ms. Bentley has not identified any evidence indicating that GreenSky knew or should have known that the application it received from Tri-State did not represent Ms. Bentley's will or intention, GreenSky cannot be directly liable in a civil cause of action under FRCA. *See Wells v. Craig & Landreth Cars, Inc.*, 2010 U.S. Dist.

LEXIS 123332, at 7 (W.D. Ky. Nov. 18, 2010) (granting a motion to dismiss a section 1681b claim against a lender for failure to allege facts "that would raise the inference that [the lender] should have doubted [a car dealer's] intentions when it submitted [an] application [on the borrower's or consumer's behalf]"); *Trikas*, 351 F. Supp. 2d at 42 (finding that a bank's credit inquiry based on the mislabeling of plaintiff's account as open, instead of closed, did not trigger FCRA liability because the bank believed it sought the report for a permissible purpose).

Ms. Bentley also claims that GreenSky violated section 1681q, which punishes criminally any person who "knowingly and willfully obtains information on a consumer from a consumer reporting agency under false pretenses." 15 U.S.C. §1681q; Compl. ¶74, ECF No. 1. As noted above, a violation of this section can trigger civil liability. This claim against GreenSky also fails because there is insufficient evidence that GreenSky knew that the credit report was obtained without Ms. Bentley's permission.

Accordingly, summary judgment must be granted on all of Ms. Bentley's FCRA claims against GreenSky.

### F. CUTPA

CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. §42-110b(a). To survive summary judgment on her CUTPA claim, Ms. Bentley must produce evidence showing a genuine question of material fact exists with respect to the following elements: that she (1) suffered an ascertainable loss of money or property, (2) that was caused by, (3) an unfair method of competition or an unfair or

deceptive act in the conduct of any trade or commerce. *See id;* Conn. Gen. Stat. §42-110g(a).

The Court finds that GreenSky cannot be liable directly under CUTPA because there is insufficient evidence that GreenSky itself was engaged in an unfair or deceptive trade practice.[13] As noted above, to determine whether conduct is unfair under CUTPA, Connecticut courts apply the cigarette rule and look to "(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise – in other words, is it within at least the penumbra of some common law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to consumers." *Ramirez v. Health Net of Northeast, Inc.*, 938 A.2d 576, 589 (Conn. 2008) (internal quotation marks and citation omitted).

Deception is a sub-category of unfairness. *See Wilkins v. Yale Univ.,* No. CV106014646S, 2011 WL 1087144, at *4 (Conn. Super. Ct. Feb. 25, 2011) ("A subset of unfair practices, recognized by our Supreme Court, is deceptive practices") (citing *Daddona v. Liberty Mobile Home Sales, Inc.,* 550 A.2d 1061, 1066-67 (Conn. 1988)). For an act or practice to be deceptive (1) "there must be a representation, omission or other practice likely to mislead consumers," (2) "consumers must interpret the message reasonably under the circumstances," and (3) "the misleading representation, omission or practice must be material – that is, likely to affect consumer decisions or conduct." *Bank*

---

[13] GreenSky argues that it cannot be held liable under CUTPA because Ms. Bentley suffered no damages as a result of GreenSky's actions. This argument is not persuasive. Under CUTPA, Ms. Bentley must show that she suffered an ascertainable loss, not necessarily "actual" or monetary damages. *See Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 813-14 (Conn. 1981) (holding that the words "ascertainable loss" in the CUTPA statute do not require proof of actual damages or a specific amount of loss and defining "ascertainable loss" as a "measurable loss" of money or property when a consumer receives "something other than what he bargained for").

*of New York v. Nat'l Funding*, No. X01CV000171525S, 2005 WL 527749, at \*5 (Conn. Super. Ct. 2005) (citing *Southington Sav. Bank v. Rodgers*, 668 A.2d 733, 736 (Conn. App. Ct. 1995)); *see also Caldor, Inc. v. Heslin,* 577 A.2d 1009, 1013 (Conn. 1990) (citation omitted).

Ms. Bentley alleges that GreenSky violated other Connecticut statutes and that these violations constitute unfair and deceptive trade practices.  Compl. ¶¶86-92, ECF No. 1 (citing the Connecticut Home Improvement Act, Conn. Gen. Stat. §20-429(e), the Connecticut Home Solicitation Sales Act, Conn. Gen. Stat. §42-135a(a)(2), and the Connecticut criminal forgery statute, Conn. Gen. Stat. §53a-139).  The Court has already concluded that GreenSky did not know that the loan application it received was completed without Ms. Bentley's permission.  Thus, it cannot have violated the forgery statute, which requires an "intent to defraud, deceive or injure another."  Conn. Gen. Stat. §53a-139(a).

Violations of the Home Improvement and the Home Solicitation Sales Acts are *per se* violations of CUTPA.  Conn. Gen. Stat. §§20-427(c) ("A violation of any of the provisions of [the Home Improvement Act] shall be deemed an unfair or deceptive trade practice under [CUTPA]"), 42-141(b) ("Violation of any of the provisions of section 42-135a, or 42-137 to 42-139, inclusive… shall constitute an unfair or deceptive act or practice as defined by [CUTPA]").  Ms. Bentley does not explain how these statutes apply to GreenSky, nor is such an application evident from the facts in the record.  Indeed, she mentions neither statute in her brief opposing GreenSky's Motion for Summary Judgment.  *See e.g.*, *Brandon v. City of New York*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (dismissing claims that plaintiff did not address in his brief opposing

defendants' summary judgment motion and collecting cases where other courts did the same).

Aside from alleging violations of these statutes, Ms. Bentley identified three practices at oral argument on the summary judgment motion that she believes were deceptive or unfair. First, she argues that GreenSky engaged in a deceptive practice when, in the August 6, 2013 letter, it referred to the loan as a "GreenSky Installment Loan." Kaliban Aff., Ex. E, Letter dated 8/6/2013, ECF No. 82-4. Ms. Bentley argues that this phrasing indicated that GreenSky was the lender, which was not true. This notation in the letter was not deceptive, because Ms. Bentley's interpretation of its meaning is not reasonable. The letter never identified GreenSky explicitly as a lender, rather it merely identified the name of the loan. Moreover, the letter provided a link to a website, where it indicated the loan agreement was available for review with the full terms. That agreement disclosed the name of the actual lender. Kaliban Aff., Ex. F, GreenSky Installment Loan Agreement, ECF No. 82-4 (identifying the lender as a StellarOne Bank). Moreover, there is no evidence that the identity of the lender was material to Ms. Bentley in any way – indeed, she maintains that she did not want any financing at all.

Second, Ms. Bentley argues that GreenSky engaged in a deceptive practice because the interest rate on the loan she actually received was different from what Tri-State promised her. The Court disagrees. The premise of Ms. Bentley's lawsuit is that she did not intend to apply for and did not want a loan from GreenSky. Moreover, it was Tri-State and not GreenSky who made the representation that Ms. Bentley claims was not honored. In fact, GreenSky's agreement with Tri-State prohibited it from making any

representation or even discussing the "applicable interest rate" of a GreenSky loan. Kaliban Aff, Ex. A, Credit Program Agreement ¶2(b)(ii), ECF No. 82-4.[14]  Thus, GreenSky cannot be held liable for a deviation from its contract where there is no evidence to suggest that it encouraged or sanctioned that deviation.

Third, Ms. Bentley argues that GreenSky engaged in an unfair trade practice when it pulled her credit report without her permission.  For the reasons discussed above in analyzing the FCRA claim, GreenSky had no reason to know that it was pulling Ms. Bentley's credit report without her permission.  Although the terms of GreenSky's loan program did permit dealers like Tri-State to submit applications on their customer's behalf, in doing so, Tri-State agreed that it was certifying that it had obtained the customer's permission to do so.  Kaliban Aff., Ex. A, Credit Program Agreement ¶11(a), ECF No. 82-4.  Thus, even assuming that pulling anyone's credit report without his or her permission could constitute an unfair trade practice, there is no evidence that GreenSky had any awareness that it was engaged in such a practice.  There is also no evidence the GreenSky intended or tacitly encouraged such a practice.  More evidence of wrongdoing is required to sustain a CUTPA claim past summary judgment.  *See A-G Foods, Inc.*, 579 A.2d at 77 (defendant's "negligence did not constitute an 'immoral, unethical, oppressive or unscrupulous' practice."); *Williams Ford*, *Inc. v. Hartford Courant Co.*, 657 A.2d 212, 228 (Conn. 1995) (finding no CUTPA violation where the defendant negligently misrepresented which advertising contract would save plaintiff the most money because

---

[14] As a practical matter, GreenSky provided Tri-State with a card containing a description of the loans and an "estimated payment factor" that it was permitted to show to customers under the terms of the agreement. *See e.g.*, Pl.'s Ex. 1, Credit Products and Dealer Cost, ECF No. 93-1.  However, Tri-State was not permitted to promise customers that they would receive a particular interest-rate on a GreenSky loan.  Tri-State appears to have done just that when it promised Ms. Bentley that she would receive financing at 3.9%.

such negligence did not constitute an immoral, unethical, oppressive or unscrupulous practice).

Moreover, Ms. Bentley did not suffer a "substantial injury" when GreenSky pulled her credit report without her permission. There is no evidence that the loan was funded, and GreenSky sought to remove the loan from Ms. Bentley's credit report when it discovered that she did not authorize the application for it.

The Court finds that the record contains insufficient evidence that GreenSky engaged in an unfair or deceptive trade practice. Accordingly, GreenSky's Motion for Summary Judgment is granted as to the CUTPA claim.

## III.    Conclusion

For all of the foregoing reasons, Ms. Bentley is permitted to amend her Complaint to add an identity theft claim against Defendants Roe and Pompilli only. The remainder of the relief requested in her Motion for Joinder, ECF No. 68, is **DENIED**. GreenSky's Motion for Summary Judgment, ECF No. 80, is **GRANTED** in its entirety, and all claims against GreenSky are dismissed.


SO ORDERED at Bridgeport, Connecticut this 30th day of December 2015.


 /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE