UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ELISE BENTLEY

v.  NO. 3:14-cv-1157 (VAB)

TRI-STATE OF BRANFORD, LLC,
BRAD POMPILLI, and DAN ROE

**RULING ON MOTION TO DISMISS COUNTERCLAIMS**

Elise Bentley ("Plaintiff") brought this action against Mr. Brad Pompilli and Mr. Dan Roe (collectively, "Defendants").[1] In her Amended Complaint, Ms. Bentley alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, et seq., the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a et seq., and the Connecticut Identity Theft Statute ("Identity Theft"), Conn. Gen. Stat. §52-571h. *See* Am. Compl., ECF No. 30. On June 22, 2017, Defendants field an Answer and raised a three count counterclaim. *See* Answer, ECF No. 148. Before the Court is Ms. Bentley's motion to dismiss the counterclaim. For the reasons that follow, this motion is GRANTED.

**I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

Ms. Bentley resides at 51 Robbins Avenue, Bristol, Connecticut. Am. Compl. ¶ 5. Mr. Pompilli is a home improvement contractor who was allegedly "doing business as Tri-State [of Branford, LLC] under the laws of Connecticut," with a main office in Branford, Connecticut. *Id.* at ¶ 7. Ms. Bentley also alleges that Mr. Pompilli was "at all times the Sales Consultants/Associate GreenSky Trade Credit, LLC." *Id.* Mr. Roe was also a home

---

[1] Ms. Bentley also sued Greensky Trade Credit, LLC, and Tri-State of Branford, LLC. The action is stayed against Tri-State because of its pending bankruptcy, and the Greensky's motion for summary judgment was granted in 2015. *See* Order, ECF No. 39; Order, ECF No. 100.

1

improvement contractor doing business as Tri-State, and allegedly shared an office and a Home Improvement Contract registration number with Mr. Pompilli. *Id.* at ¶ 8.

In July 2013, Tri-State allegedly mailed a postcard to Ms. Bentley that "contained an offer to homeowners … of assistance to obtain up to $25,000 for home improvement under a federal program." *Id.* at ¶ 10. Ms. Bentley allegedly completed the form contained on the postcard and mailing the completed postcard back to Tri-State. *Id.*

On Friday, August 2, 2013, Mr. Roe visited Ms. Bentley's home in Bristol, Connecticut to "discuss how he and Tri-State would assist her apply for this home improvement federal program." *Id.* at ¶ 12. Ms. Bentley alleges that she completed an "application document that had 'GE Capital' on the application document for the home improvement federal program." *Id.* at ¶ 13.

Ms. Bentley alleges that Mr. Roe offered her financing for home improvement and that she rejected this offer "on very clear terms." *Id.* at ¶ 16. The parties then completed home improvement contract and Ms. Bentley submitted a down payment. *Id.* at ¶¶ 17-20. Ms. Bentley alleges that she "believed she was applying for federal government assistance and any application or paperwork would be for the federal government assistance program." *Id.* at ¶ 26.

On August 7, 2013, after allegedly investigating other contractors to do her home improvement work, Ms. Bentley called Mr. Roe to cancel their agreement. "It was at this time," Ms. Bentley alleges, "that Roe explained to [her] for the first time, that she was bound to a contract with Tri-State in which her right to cancel ended the day before, on Tuesday, August 6, 2013." *Id.* at ¶ 30. Mr. Roe allegedly "also told Bentley during this telephone discussion that she would be liable for a cancellation fee of 75% of $14,179.00 which amount represented the total cost of the work, if she did not continue with the home repair work as quoted." *Id.* at ¶ 33.

After Ms. Bentley reiterated to Mr. Roe that she had believed that "she had only received a work quote from him and that the GE Capital application document she signed on August 2, 2013 was for the application to qualify for the federal government home improvement assistance program," *id.* at ¶ 34, Mr. Roe replied that "the financing was the government offered program and that the financing of 3.9% with no prepayment penalty is what he can do to assist with the cost of the job." *Id.* at ¶ 35. Ms. Bentley then repeated that she did not want financing and Mr. Roe recommended that she call the owner of Tri-State. *Id.* at ¶ 36.

Ms. Bentley spoke to Mr. Pompilli, who, she alleges, was "owner of Tri-State," on August 12, 2013. *Id.* at ¶ 39. On the phone, Mr. Pompilli allegedly explained that Ms. Bentley "would be liable to pay a cancellation fee of 75% of $14,179.00, the quoted price, because Tri-State was already out of the cost of material and financing for the work." *Id.* Mr. Pompilli allegedly "said he would not argue and read to her the fine print on the transaction work document that she would be charged 75% of the cost of the job." *Id*. at ¶ 43. Ms. Bentley recorded the conversation. *Id.* at 39.

On Friday, August 16, 2013, Ms. Bentley allegedly received "a letter from GreenSky congratulating her on her new 'GreenSky Installment Loan,' an open-ended home equity plan or a closed-ended variable-rate home equity plan." *Id.* at ¶ 48. Ms. Bentley alleges that "GreenSky and its brokers and or agents, Tri-State, Pompilli and Roe provided Ms. Bentley, without her applying for GreenSky home improvement loan … for $12,762 for the home improvement work, and sought to secure the installment loan by the equity in her residential property." *Id.* at ¶ 54. Ms. Bentley alleges that Mr. Roe and Mr. Pompilli both told her that the interest rate for the loan for their home improvement work, which she rejected, would be 3.9%. *Id.* at ¶¶ 35; 41; 55; 57.

In actuality, she alleges, the loan "contained an unconscionable interest rate between 17.99% and 23.99%. *Id.* at ¶ 55.

On May 22, Ms. Bentley filed an Amended Complaint in which she alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.*, the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a *et seq.*, and the Connecticut Identity Theft Statute ("Identity Theft"), Conn. Gen. Stat. §52-571h. On June 22, 2017, Defendants field an Answer and raised a three count counterclaim. In Count One, they claim that Ms. Bentley is liable for breaching her home improvement contract with Defendants by declining their "generous offer to return the down payment back to her." Answer, 6. In Count Two, they claim that Ms. Bentley is liable for "unlawful wiretap." *Id.* at 9. In Count Three, they claim that Ms. Bentley is liable for "breach of good faith/fair dealing." *Id.* Defendants claim a variety of types of damages in relation to these counterclaims. *Id.* (describing "compensatory damages, expectation damages, reliance damages/ promissory estoppel, restitution damages/ unjust enrichment, attorneys' fees, statutory damages, punitive treble damages, damages in equity."). Ms. Bentley has moved to dismiss all three counts of the counterclaim.

## II. STANDARD OF REVIEW

When considering a motion to dismiss under Fed R. Civ. P. 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir. 2002) (citation omitted), *cert. denied*, 537 U.S. 1089 (2002). The proper consideration is not whether the plaintiff ultimately will prevail, but whether he has stated a claim upon which relief may be granted such that he should be entitled to offer evidence to support his claim. *Id.* at 125 (citation omitted).

When reviewing a complaint under Rule 12(b)(6), the Court applies a "plausibility standard" that is guided by two principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). First, the requirement that the Court accept as true the allegations in a complaint "is inapplicable to legal conclusions." *Id.* Although "detailed factual allegations" are not required, a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action[]" or "naked assertion[s]" devoid of "further factual enhancement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007). Second, to survive a motion to dismiss, the complaint must state a plausible claim for relief. *Iqbal,* 556 U.S. at 679. Determining whether the complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679) (internal quotation marks omitted).

### III. ANALYSIS

#### A. Counts One and Three

Ms. Bentley argues that Counts One and Three of Defendants' counterclaim should be dismissed because Defendants were not party to the Contract, which listed Tri-State as party. In addition, she argues that Defendants cannot invoke the Contract in their counterclaims because it was not compliant with the requirements of the Home Improvement Act and was therefore void. *See* Pl.'s Mot., 10 (citing Connecticut Home Improvement Act, C.G.S.§20-418 *et seq.*). The Court agrees with the first argument and therefore, does not address the second argument. The dismissal of these counterclaims, however, also emphasizes the appropriateness of limiting the scope of Plaintiff's case, as discussed below.

Ms. Bentley argues that Defendants cannot invoke the Contract because it was signed by Tri-State rather than Mr. Roe or Mr. Pompilli. Generally, agents are not liable for contracts on

5

signed by their principals—even if they signed them and especially if they did not. As the Restatement explains, "if an agent does not become a party to a contract and is not subject to liability on the contract as an individual, the agent should not be able to assert rights as an individual derived from the contract in the absence of indicia that the parties to the contract so intended." *See* Restatement (Third) Of Agency § 6.01 (2006); *Joseph Gen. Contracting, Inc. v. Couto,* 317 Conn. 565, 582, 119 A.3d 570, 582 (2015) ("[I]t has been held that an agent will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute his personal liability for, or to, that of his principal.").

An agent, even one who acts outside the scope of his authority when making a contract, does not generally become a party to a contract made by his principal. *See DeSalle v. Appelberg*, 60 Conn. App. 386, 389, 759 A.2d 537, 540 (2000) (citing *Sullivan v. Mancini*, 103 Conn. 110, 112–13, 130 A. 79 (1925) ("[T]he personal liability of one who contracts as agent for a named principal, without sufficient authority, is stated as follows: In such cases the agent is not ... bound by the contract, because nobody intended that he should be so bound.")); *Parcel Mgmt. Auditing & Consulting, Inc. v. Dooney & Bourke, Inc*., No. 3:13-CV-00665 JAM, 2015 WL 796851, at *4 (D. Conn. Feb. 25, 2015) ("Regardless of Cerqueira's authority to sign the agreement on behalf of Dooney, he cannot be held liable for breach of contract for a contract that he signed in his official capacity and to which he was not personally a party.").

There are some exceptions, though. An agent can enforce a contract, even if the instrument named him as an agent of principals, when court finds that "the principals unequivocally manifested their intention to authorize the plaintiff to exercise the rights" under the contract. *Kennedy Funding, Inc. v. Greenwich Landing, LLC*, 135 Conn. App. 58, 64 (2012).

6

Alternatively, an agent or corporate officer may be liable when the record shows that the corporation was a mere "instrumentality" for the agent, or in other circumstances where piercing the corporate veil is appropriate. *Connecticut Light & Power Co. v. Westview Carlton Grp., LLC*, 108 Conn. App. 633, 640, 950 A.2d 522, 527 (2008) (applying the "instrumentality test for piercing the corporate veil" and finding that individual defendant could be liable for breaching contract signed by corporation). A corporation is an instrumentality only after proof of three elements:

> (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.* Courts have also found that veil-piercing in contract actions is appropriate when "the plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun." *Naples v. Keystone Bldg. & Dev. Corp.*, 295 Conn. 214, 232, 990 A.2d 326, 339 (2010). "Courts decline to pierce the veil of even the closest corporations in the absence of proof that failure to do so will perpetrate a fraud or other injustice." *Id.* at 234; *see Lewis v. Frazao Bldg. Corp.*, 115 Conn. App. 324, 336, 972 A.2d 284, 292 (2009) (individual contractor not liable for liable for the breach of contract because trial court found that the plaintiff "was engaging the services of [the corporation] and that he was dealing with the corporate entity," despite plaintiff's argument that veil-piercing was appropriate).

The allegations in Ms. Bentley's Complaint and Defendants' Answer and counterclaims do not suggest that either party views Tri-State as an "instrumentality" of either individual

7

defendant. Ms. Bentley alleges that Mr. Pompilli was the "owner" of Tristate, but she does not suggest that he "used his control over the corporation in order to commit or to avoid liability for any personal wrongful act." *Campisano v. Nardi*, 212 Conn. 282, 293–94 (1989) (rejecting attempt to hold principal of dissolving construction corporation personally liable for breach of contract). The record is also absent of allegations that either Defendant was in "direct control" of Tri-State, shared assets with Tri-State, or maintained Tri-State as a corporate fiction. *Connecticut Light & Power Co.*, 108 Conn. App. at 638-41 (proper to pierce corporate veil when individual defendant was sole owner and manager of corporation that never filed corporate tax returns). Furthermore, neither party alleges that Ms. Bentley believed that the Contract bound Mr. Roe or Mr. Pompilli individually—indeed, Ms. Bentley argues the opposite in her motion to dismiss. The Court therefore sees no reason to allow Mr. Roe or Mr. Pompilli to invoke the rights that the Contract designated to Tri-State. *D. Klein & Son, Inc. v. Good Decision, Inc.*, 147 F. App'x 195, 198 (2d Cir. 2005) ("The reason veil piercing in the contract context is infrequent is because the party seeking relief is presumed to have voluntarily and knowingly entered into an agreement with a corporate entity, and is expected to suffer the consequences of limited liability associated with the business form.") (internal citations omitted).

Defendants argue that Ms. Bentley's objection to the breach of contract claim "is entirely 'void' of any merit" because Ms. Bentley "chose and sought to pierce the corporate veil and sue these individual Defendants on a personal / individual basis." Opp. Mem., 3. The Court understands Ms. Bentley's claims differently. Because Ms. Bentley makes no allegations about the relationship between the individual Defendants and the corporate one, the Court presumes that she does not seek to pierce the corporate veil to hold Mr. Roe or Mr. Pompilli liable for Tri-State's actions. Ms. Bentley included allegations against Tri-State in many of her allegations

8

against Mr. Roe and Mr. Pompilli.  *See, e.g.* Am. Compl. 59 ("On August 5, 2013 and on August 6, 2013 respectively, Tri-State, Pompilli and Roe knowingly and willfully and or negligently obtained information on Bentley . . . .").  The Court does not read these claims to allege that Tri-State is an "instrumentality" of either Defendant, particularly given Ms. Bentley's own argument in her motion to dismiss.  Rather, Ms. Bentley makes allegations against Mr. Roe and Mr. Pompilli and if Tri-State were a party, she would make many of the same allegations—as well as some additional ones—against it.

Because Tri-State is not a party in the current dispute, the Court will only allow evidence about the claims that concern Mr. Roe and Mr. Pompilli directly, and will exclude all evidence related to Tri-State's liability.  *See* Order, ECF No. 39; *Ali v. Mukasey*, 529 F.3d 478, 490 (2d Cir.2008) ("The law of the case doctrine, while not binding, counsels a court against revisiting its prior rulings in subsequent stages of the same case absent cogent and compelling reasons such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.") (internal citations omitted) (staying case against Defendant Tri-State on account of its bankruptcy).  Furthermore, the Court cannot instruct the jury on claims that involve actions alleged on behalf of Tri-State, such as the CUTPA claims that arise from the preparation of an allegedly deficient home improvement contract.  *See* Order, ECF No. 39.  As Ms. Bentley argues, the Contract did not bind Mr. Roe or Mr. Pompilli, and they therefore cannot be liable for any violations that it contained.  Given this argument, as well as the allegations in Ms. Bentley's Complaint, the Court must dismiss Defendants' breach of contract counterclaim against Ms. Bentley, but also exclude from this trial any contract-based claims relating to Tri-State alone.

**B. Count Two**

Ms. Bentley also seeks to dismiss Count Two of the counterclaim, which states a claim for unlawful wiretapping under Conn. Gen. Statute § 52-570d. The statute provides that:

> (a) No person shall use any instrument, device or equipment to record an oral private telephonic conversation unless the use of such instrument, device or equipment (1) is preceded by consent of all parties to the communication and such prior consent either is obtained in writing or is part of, and obtained at the start of, the recording, or (2) is preceded by verbal notification which is recorded at the beginning and is part of the communication by the recording party, or (3) is accompanied by an automatic tone warning device which automatically produces a distinct signal that is repeated at intervals of approximately fifteen seconds during the communication while such instrument, device or equipment is in use.

Conn. Gen. Stat. Ann. § 52-570d. The statute adds that "[a]ny person aggrieved by a violation of subsection (a) may bring a civil action in the Superior Court to recover damages, together with costs and a reasonable attorneys' fee." *Id.* at (c).

While the recording statute does not include a statute of limitations, the Connecticut General Statutes state that "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of." Conn. Gen. Stat. § 52-577; *Spahr v. Wellner*, No. CV96 0155780 S, 1998 WL 458067, at *1 (Conn. Super. Ct. July 28, 1998) (applying the statutes of limitations under General Statutes § 52-577 and § 52-585 to a claim under § 52-570d(c)).

Under this statute, the three-year statute of limitations begins to run when the tort occurred. The Supreme Court has observed that "the history of [52-577's] language precludes any construction thereof [that delays] the start of the limitation period until the cause of action has accrued or the injury has occurred." *Certain Underwriters at Lloyd's, London v. Cooperman*, 289 Conn. 383, 408 (2008) (internal quotation marks omitted); *Valentine v. LaBow*, 95 Conn.App. 436, 445 n. 8 ("§ 52–577 is an occurrence statute and ... its limitation period does not begin when the plaintiff first discovers an injury") (internal quotation marks omitted), *cert.*

*denied*, 280 Conn. 933, 909 A.2d 963 (2006). Ms. Bentley alleges that she recorded her conversation with Mr. Pompilli on August 12, 2013. The three-year statute of limitations began to run on that date, and Defendants' counterclaim is therefore time-barred.

Defendants, however, argue that the statute of limitations on this action might have been tolled. "At the least," they argue, "this issue (of potential tolling) raises a genuine issue of fact that cannot be decided on a motion to dismiss." Opp. Mem., 5.

Nevertheless, although "detailed factual allegations" are not required to survive a motion to dismiss, a complaint or counterclaim must offer more than "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 557. Defendants do not make factual allegations supporting either their illegal wiretapping counterclaim or the applicability of any equitable tolling doctrine to their case. Furthermore, Defendants have not filed an Answer to Ms. Bentley's Amended Complaint.[2] While the Court acknowledges that both the illegal wiretapping statute and a tolling doctrine could apply to this case, Defendants' counterclaim has not alleged the "grounds" of their "entitle[ment] to relief." *Id.* As a result, the Court must dismiss this counterclaim, as it has been alleged.

## IV. CONCLUSION

For the reasons stated above, Ms. Bentley' motion to dismiss is GRANTED.

SO ORDERED at Bridgeport, Connecticut this 6th day of August.

/s Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE

---

[2] Mr. Roe filed an Answer to the original Complaint in 2015. *See* Answer, ECF No. 17. Defendants filed their Answer/Special Defenses/Counterclaims on June 23, 2017. *See* ECF No. 147. That document stated "for convenience, The specific Denials in this Answer will be filed by separate cover." *Id*. at 1. The docket does not reflect that Defendants filed an Answer after this filing.